# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ROWAN UNIVERSITY, a New Jersey institution of higher education,<br><br>Plaintiff,<br><br>v.<br><br>FACTORY MUTUAL INSURANCE COMPANY, a Rhode Island corporation,<br><br>Defendant. | Civ. Case No. _____ |

## <u>COMPLAINT</u>

1.      Rowan University ("Rowan" or "Plaintiff") is a New Jersey public institution of higher education headquartered in 201 Mullica Hill Road, Glassboro, New Jersey 08028-1702, which, along with others, acquired the insurance policy described herein, issued by Defendant Factory Mutual Insurance Company, covering the following twenty-four insured locations in New Jersey owned and/or operated by Rowan:

   a.   201 Mullica Hill Road, Glassboro, NJ 08028-1700;

   b.   129 N Broadway, Camden, NJ 08102-1164;

   c.   1 & 2 Medical Center Drive and 40 & 42 East Laurel Rd, Stratford, NJ 08084-1500;

   d.    113 East Laurel Road, Stratford, NJ 08084-1363;

   e.   401 South Broadway, 414 S. 5th Street & 512 Benson Street, Camden, NJ  08103-1211;

   f.   129 N Broadway Camden, NJ 08102-1164;

   g.   107 Gilbreth Parkway, Mullica Hill, NJ 08062-4446;

h.   109 Gilbreth Parkway, Mullica Hill, NJ 08062-4445;

i.   625 Woodbury Glassboro Road, Sewell, NJ 08080-3733;

j.   306 Bailey Road, Mullica Hill, NJ 08062-2518;

k.   405 Hurffville Crosskeys Road Suites 202, 203 & 2011, Sewell, NJ 08080-9344;

l.   2150 Route 38, Cherry Hill, NJ 08002-4302;

m.   570 Egg Harbor Road, Sewell, NJ 08080-2359;

n.   373 South White Horse Pike, Hammonton, NJ 08037-1135;

o.   100 Century Pkwy Ste 140 & 350, Mount Laurel, NJ 08054-1149;

p.   113 East Laurel Road, Stratford, NJ 08084-1363;

q.   412 Ewan Road Suite B, Mullica Hill, NJ 08062-3707;

r.   1100 Laurel Oak Road, Voorhees, NJ 08043-4363;

s.   104 E Quillytown Rd, Penns Grove, NJ 08069-3614;

t.   93 Zee Rd, Mullica Hill, NJ 08062-4439.

2.   Defendant Factory Mutual Insurance Company ("Defendant") is incorporated under the laws of the State of Rhode Island with its principal place of business in Johnston, Rhode Island.  It actively solicits business and issues policies, including this one, in the State of New Jersey.

## **JURISDICTION AND VENUE**

3.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.  Diversity exists between the Plaintiff and the Defendant and the amount in controversy exceeds $75,000, exclusive of interests and costs.

4.      Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in this District and a substantial part of the property that is the subject of the action is situated in this District.

## FACTS

### I.    Rowan's Policy

5.      Plaintiff purchased commercial property insurance policy # 1055865 (the "Policy"), effective July 1, 2019 through July 1, 2020, to insure Plaintiff's properties described in paragraph 1, *supra*. A paginated copy of the Policy, prepared by Plaintiff's Counsel for the convenience of the Court, is attached hereto as Exhibit A. The Policy is incorporated herein and made a part of this Complaint.

6.      The Policy is an all-risk commercial property insurance policy that provides coverage for physical loss of or damage to the insured property from *all risks* unless expressly limited or excluded by language in the body of the Policy or through a separate exclusion endorsement. See Ex. A at POLICY 0008.

7.      The Policy includes coverages for business income losses and extra expenses, civil authority, interruption by communicable disease, decontamination costs, communicable disease response, protection and preservation of property, and claims preparation costs. *Id.* at POLICY 0034, 0036, 0044, 0053, 0057, 0060, 0066 and 0073.

8.      There is no exclusion in the Policy for lost business income and expenses caused by either emergency Orders limiting one's business or the pandemic causing property damage and restricting Plaintiff's business activities at its properties, or both.

9.      The Policy sold by the Defendant to Plaintiff, like all insurance policies, must be read as a whole.

10.     The Defendant has numerous duties under the insurance policy, including (but not limited to) answering insured questions regarding coverage, receiving loss notices, honestly investigating and assessing claims without a predetermined result, and issuing declination of coverage letters when appropriate, and promptly paying the claim when appropriate.

11.     All conditions precedent to this action have been performed or have been waived.

12.     Despite agreeing to cover Rowan for all risks of physical loss or damage to property resulting from any cause not excluded, as well as the resulting time element and extra expense losses, Defendant has refused to honor its contractual obligations in the face of a claim for which coverage is expressly provided.  Instead, Defendant attempts to wrongfully shoehorn Rowan's claim into a narrow and limited grant of coverage, while contending – without textual support – that all other coverage is excluded. Defendant must nevertheless cover the loss sustained by Rowan that Defendant contractually agreed to insure.

13.     While soliciting Rowan's business, Defendant touted its "Market Leading Claims Service'' as a key reason why Rowan should procure coverage from Defendant, claiming to "[f]ocus on **finding coverage** instead of exclusions" and "[f]air and **prompt** payment of losses."

14.     On information and belief, Defendant represents that it evaluates all claims in good faith, in a manner consistent with the plain language of the policy and pursuant to the applicable law governing the interpretation of the relevant policy.

## II.     COVID-19 and State and Local Emergency Orders

15.     The World Health Organization ("WHO") has declared a global pandemic as a result of SARS-CoV-2, the name given to the virus belonging to the *orthocoronavirinae* subfamily (COVID-19 virus), which, based on today's knowledge and science, is transmitted through

respiratory droplets, fomites or aerosols which remain suspended in the air for prolonged periods of times.

16.    On March 11, 2020, WHO declared the COVID-19 outbreak a pandemic and former President Trump declared a nationwide emergency due to the public health emergency caused by the COVID-19 outbreak in the United States.

17.    A pandemic, by definition, is an ''epidemic occurring worldwide . . . .''[1]

18.    The global COVID-19 pandemic is exacerbated by the fact that the coronavirus is a physical substance that directly lives on and is active on surfaces of objects or materials in a building for extended periods. The COVID-19 virus is airborne, directly emitted and permeates the insured property and premises. The virus is spread, in part, because of its aerosol transport in and throughout buildings and their airways.

19.    The COVID-19 virus is a cause of real physical loss of or damage to property. According to a study published in THE NEW ENGLAND JOURNAL OF MEDICINE, the virus adheres to its environment, remaining stable and transmittable in aerosols for at least three hours, up to four hours on copper, up to 24 hours on cardboard and up to two to three days on plastic and stainless steel. These are common objects found in Rowan's insured premises. Other studies suggest a longer lifespan.[2]

20.    Educational institutions like Plaintiff are highly susceptible to being or becoming affected by the presence of the virus, as both respiratory droplets and fomites are likely to be retained on the Covered Property or in its air, remaining viable for an extended period of time.

---

[1] See https://www.who.int/bulletin/volumes/89/7/11-088815/en/#:~:text=A%20pandemic%20is%20defined%20as,are%20not%20considered%20pandemics (last viewed on Feb. 23, 2021).

[2] Scientific findings are dynamic and may continue to evolve prior to trial.

21.     Rowan's properties are also highly susceptible to being affected by the rapid transmission of the virus because of the nature of the property and its use as a highly social context in close proximity to the property, to one another, and to the existing load of the COVID-19 virus' presence at surfaces or aerosol.

22.     The material dimensions of a property can be altered and damaged through microscopic changes caused by the COVID-19 virus. Such damage may produce deadly results to human beings. If a person infected with the COVID-19 virus enters a building, then (until disinfected) the building would be (1) physically altered by the direct physical presence of the virus on surfaces or the air, and (2) thus physically damaged, and (3) may potentially be transformed into a superspreading viral incubator.

23.     One of the best ways to mitigate the presence of COVID-19 in a building is to depopulate it by keeping COVID-19 virus carriers out or lowering the number of people allowed in at one time in combination with a vigorous cleaning routine and structural alterations, such as using plexiglass dividers.

24.     Many COVID-19 viral carriers (people) can infect others even though these carriers are asymptomatic. These carriers can transmit the virus directly or indirectly. Since the virus travels in aerosols or remains active on surfaces after being emitted by the carriers when they speak, shout, or sing, viral aerosols often end up on surfaces, in the air, and air circulation equipment of buildings.

25.     When it became apparent that publicity alone concerning COVID-19 would not naturally facilitate voluntary actions that would mitigate the pandemic the world is facing, state and local authorities intervened through a series of emergency Orders.

26.    For the most part (including those causing Plaintiff's loss), the emergency Orders were issued pursuant to an executive's emergency powers. They were not the result of the legislative or deliberative body's process typical of laws and regulations.

27.    Plaintiff complied with all applicable Orders.

28.    These and other unprecedented emergency Orders were hardly a foregone conclusion or obvious consequence of the pandemic, as evidenced by the great variance between states and localities as to the types and extent of restrictions placed on businesses.

29.    A nationwide debate has erupted as to the Orders' necessity, appropriateness, breadth and length with some high-profile federal and state officials in some circumstances questioning the motivation behind them or their continuation.

30.    New Jersey was among the first states to declare a state of emergency, with Governor Phil Murphy declaring a state of emergency and a public health emergency on March 9, 2020.   The declaration allowed the State to direct state resources to affected communities, and prohibited excessive price increases on goods and services, Order 103. Governor Murphy declared: "It shall be the duty of every person or entity in this State or doing business in this State . . . to cooperate fully with the State Director of Emergency Management and the Commissioner of DOH in all matters concerning this state of emergency."  At the time of the Order the pandemic was pervasive and/or posing an imminent risk of harm to people and property.

31.    On March 16, 2020, Governor Murphy, in conjunction with New York Governor Andrew Cuomo and Connecticut Governor Ned Lamont, ordered that as of 8 p.m. that evening, all gyms, movie theaters, bars, and casinos were to be closed. Restaurants were limited to take-out and delivery orders only. Governor Murphy issued Executive Order No. 104, declaring it "necessary to limit the unnecessary movement of individuals in and around their communities and

person-to-person interactions." Through this same Executive Order, Governor Murphy ordered all institutions of higher education to cease in-person instruction effective on March 18, 2020.[3] Since that time, Plaintiff, as well as all other businesses in New Jersey, have been unable to operate in the ordinary course of business.

32.     On March 21, 2020, Governor Murphy issued a "stay at home" Executive Order 107, ordering New Jersey residents to stay at home, except for necessary travel, and mandated that all non-essential businesses close until further notice, cancelling gatherings of individuals, and closing brick-and-mortar premises of all non-essential retail businesses. He also renewed the directive that higher education institutions cease in-person instruction.

33.     On May 5, 2020, Governor Murphy announced that statewide school closures and the in-person restrictions for higher education were extended through the end of the 2019-2020 academic year. By then, there were over 130,000 positive cases of COVID-19 in New Jersey, with at least 8,244 of those cases having resulted in death.  There were positive cases of COVID-19 in every county in New Jersey, and there have been deaths relating to COVID-19 in every county in New Jersey.

34.     On May 6, 2020, Governor Murphy ordered that emergency measures the State had taken to address COVID-19 must continue, and the prior Executive Orders would remain in full force and effect.

35.     "[T]he spread of COVID-19 in New Jersey constitutes an ongoing public health hazard that threatens and presently endangers the health, safety, and welfare of the residents of one or more municipalities or counties of the State, and it is necessary and appropriate to take action

---

[3]  See https://nj.gov/infobank/eo/056murphy/pdf/EO-104.pdf (last viewed on Feb. 23, 2021).

against this public health hazard to protect and maintain the health, safety, and welfare of New Jersey residents . . . ."[4]

36.     These Orders, as they related to the closure of all "non-essential businesses" and the suspension of medical and dental procedures, evidence awareness on the part of both state and local governments that COVID-19 causes damage vis-a-vis contamination to property.  This is particularly true in places such as Plaintiff's business where the requisite contact and interaction causes property to be infected as well as a heightened risk of the property becoming infected by COVID-19.

37.     These emergency Orders confirmed that the presence or suspected presence of COVID-19 caused damage to property by rendering such businesses too dangerous to operate.

38.     The goal of the emergency Orders was to mitigate actual or imminent harms caused by disease-causing agents, and to protect people and property.

39.     As an institution of higher education and as a non-essential business with operations in locations under emergency Orders, Rowan has been required to comply with applicable Orders.

40.     The emergency Orders required almost complete closure of Rowan locations. On the week of March 16, 2020, remote work was implemented throughout Rowan's locations and residential dormitories were restricted to only those students who were homeless or who were unable to return to a home due to exigent circumstances. On March 19, 2020, Rowan leadership restricted access to the buildings, only allowing essential workers (e.g., Healthcare workers, Facilities, Custodial) to be physically present. In addition, Rowan extended Spring Break to March 30, 2020 and then classes resumed online for the remainder of the term. Many of these locations

---

[4] See Executive Order-138 https://www.fmcsa.dot.gov/emergency/new-jersey-executive-order-138 (last viewed on Feb. 23, 2021).

have reopened but are subject to emergency Orders limiting operational capacity and increasing costs of operation.

## III.     Rowan's Losses – The Devastating Slowdown and/or Cessation of Plaintiff's Business Activities

41.     Rowan has a total of 2,294 faculty members and 2,425 non-faculty employees, and it offers bachelors through doctoral programs to an approximate 19,600 students through its campuses in Glassboro, Camden and Stratford, New Jersey. Home to the Cooper Medical School of Rowan University and the Rowan School of Osteopathic Medicine, it is one of only three universities in the nation to grant both M.D. and D.O. medical degrees.

42.     All of Plaintiff's 24 locations spread throughout its campuses in Glassboro, Camden and Stratford, New Jersey, are insured properties under the Policy. See Ex. A at POLICY 0092-0101.

43.     Institutions of higher education, such as Plaintiff, have been hit particularly hard by the ongoing COVID-19 pandemic. Since the disease began to spread rapidly across the country in late February and early March 2020, almost every college and university, including Rowan has taken drastic and unprecedented action to protect its students, faculty, staff, and the general public from COVID-19. This was no easy task. Most institutions of higher education are more like small or medium sized cities than mere schools, and Rowan is no exception. In addition to educating the future of America, they provide housing for hundreds or thousands of students; serve and sell food; operate stores; employ large numbers of faculty, administrators, and other employees; sponsor sports teams; host public events; and perform many other services.

44.     Apart from the nightmarish logistical challenge, and the serious disruption to its core mission of education, the measures Rowan has taken as a result of the COVID-19 pandemic have had a significant financial impact. After reducing dorms and dining halls to very limited

10

student population and skeleton operations, Plaintiff provided room-and-board reimbursements, totaling in the millions of dollars to those students who were forced to leave campus. Other substantial losses include lost revenue from on-campus events; lost revenue from tuition discounts; lost revenue from cuts to public allocations to all state-supported agencies and many others. And these losses may continue or worsen if these precautions continue.

45.     The profits derived from Plaintiff's operations had a drastic hit with the slow down and radical changes implemented to Plaintiff's operations, which in some cases included complete cessation of certain operations. Plaintiff believed that the Policy bought from Defendant in full effect would insure against unforeseen perils such as the COVID-19 pandemic and ensuing emergency Orders.

46.     During the Policy period, in response to the emergency Orders and in order to protect the health of its students, faculty, and staff, Plaintiff discontinued the majority of in person operations on its campuses, shifted classes to online platforms and offered reimbursement for parking, living and eating expenses to its students, among other things.

47.     Public health authorities understood that the risk of harm to people and property was real, concrete and imminent as COVID-19 was exploding in the general population at an alarming rate.

48.     Whether a building has been infected prior to the emergency Orders or was at imminent risk of being invaded by the COVID-19 virus can be demonstrated by circumstantial evidence.

49.     Beginning in March 2020, Plaintiff was forced to severely restrict on-campus activities even canceling academic, sports and entertainment events it would normally provide at

its properties and derive revenue from, all as a result of, and in connection with the COVID-19 pandemic and related governmental restrictions on non-essential business.

50.     Since March 16, 2020 Plaintiff was not permitted to allow the majority of on-premises activities other than those required for life/safety, operating almost entirely through an online platform. With the passing of time, as the emergency Orders allowed, Plaintiff began to return certain in person operations with limited capacity on-campus. As a direct result of the emergency Orders described herein, Rowan has incurred a physical loss of (or alternatively, damage to) their properties for regular operations.

51.     Specifically, Rowan lost the ability to provide specific services at its properties, was denied access to certain of the properties to provide certain services, the majority of its students and staff were prevented from physically occupying the properties, causing the properties to be physically uninhabitable by students, staff and faculty members except in cases of emergency, causing their function to be nearly eliminated, and causing a suspension of Rowan's normal operations.

52.     This loss of and/or damage to Rowan's insured properties caused Rowan a substantial loss of gross earnings and gross profit with substantial incurred extra expenses.

53.     As a result of the emergency Orders Rowan suffered business income and extra expense losses.

54.     Rowan alternatively states that it suffered direct physical loss of, or damage to its property causing business income and extra expense losses, as a result of:

(i)     its reasonable actions—regardless of emergency Orders—to preserve property and persons from an imminent risk of harm; or

12

(ii)     the risk of imminent harm, as said risk of imminent harm is itself a covered cause of loss; or

(iii)    emergency Orders designating Rowan's business as uninhabitable and unusable on premises and in other forms without a prior governmental finding of on-site contamination; or

(iv)    emergency Orders pursuant to inherent authorities to act in a disaster regardless of the actual presence of COVID-19 virus on-site; or

(v)     the availability of other coverages under the Policy.

55.     Rowan's losses and expenses at its insured properties have continued through the date of filing of this action, and various operations restrictions in the emergency Orders are likely to continue.

56.     Rowan's actions were reasonable and necessary to comply with the various Orders or to mitigate the damages described herein to prevent greater harms, or both.

57.     Rowan's causes of loss are not excluded by the Policy.

58.     Rowan has suffered substantial losses of insured business income and has incurred insured expenses caused by insured causes of loss within the terms and conditions of the Policy, or the common law.

**IV.     Plaintiff Purchased Insurance for Its Business, Not Just Its Buildings**

59.     In order to protect its property, business, *and* income from losses, Plaintiff obtained the Policy issued by the Defendant.

60.     At all relevant times, the Policy was in full effect as Plaintiff paid premiums due which the Defendant accepted. Rowan has been insured with the Defendant since 2006, paying the required premiums annually.

61.     Rowan has continuously relied on the Defendant's promises to cover its insured business income losses and its additional extra expenses caused by such losses.

62.     The premium Plaintiff paid included coverages for, *inter alia*, real property, personal property, time element including business income and extra expense. It also encompassed additional coverages for claims preparation costs, communicable disease response, interruption by communicable disease, decontamination costs, protection and preservation of property, contingent time element extended, extended period of liability, civil authority, ingress/egress and attraction property. The coverages are set forth in Exhibit A.

**V.     Relevant Policy Provisions Provide Coverage for Plaintiff's Loss**

63.     The losses and expenses incurred by Rowan's business operations are covered under various Policy provisions.

64.     The Policy must be read as a whole in light of its purpose and the reasonable expectation of the parties.  Rowan's Policy is an all-risk commercial property insurance policy that covers insured property "against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy." See Ex. A at POLICY 0008.

65.     In effect, Plaintiff has to prove a risk of physical loss or damage.  Loss of use of property because of the imminent and substantial endangerment to people and property from a disease-causing agent is recognized in New Jersey as physical loss or damage. E.g., Gregory Packing v. Travelers, No. 2:12-CV-04418 WHW, 2014 WL 6675934, at *2 (D.N.J. Nov. 25, 2014) (Ammonia).

66.     There are no exclusions in Rowan's Policy for the loss of business income caused by emergency Orders, or the pandemic; or alternatively, otherwise resulting in the physical loss of or damage to Rowan's properties.

### A.     Preservation of Property

67.     The Policy under "Protection and Preservation of Property" covers "reasonable and necessary costs incurred for actions to temporarily protect or preserve immediately impending, insured physical loss or damage to such insured property." Ex. A at POLICY 0044. Closing or depopulating the University pursuant to emergency Orders was designed to preserve and protect property. There is no limit on this liability. Since a covered or insured physical loss or damage under the Policy is the actual presence of a communicable disease, then it constitutes a physical loss or damage of the type insured.

68.     Rowan acted to protect and preserve its property, and the lives of its community, and continues to do so for the foreseeable future. It was certainly reasonable and necessary to comply with the Governor's emergency Orders which were designed to mitigate the harm to people and property in the face of a pandemic disaster. These harms were certainly imminent and substantial and had manifested throughout the state and locally.

### B.     Time Element Coverages

69.     The Time Element Coverage and Extended Time Element Coverage covers Rowan's deprivation of the unlimited use of its property and associated business income losses, as well as providing coverage for the time after the removal of the last Executive Order to ramp back up to pre loss levels of profitability.  Time Element Coverage covers losses resulting from physical loss or damage of the type insured. *See* Ex. A at POLICY 0050.  It covers, without limitation, lost gross earnings and / or gross profits, *id.* at POLICY 0051, 0053, and tuition fees as defined, *id.* at POLICY 0055, up to the Policy's applicable limits and sublimits.

70.     Rowan has suffered and continues to suffer substantial loss of business income during the Policy term which were caused by the loss of or damage to their insured property at the covered locations.

71.     Plaintiff's loss of business income is covered under the Policy and has not been excluded from coverage, thus, Plaintiff is entitled to payment for these business income losses.

**C.     Extra Expense**

72.     The Time Element section also provides coverage for 'Extra Expense.' Ex. A at POLICY 0057. Extra Expenses are recoverable if reasonable and necessary extra costs are incurred during the period of liability, including "to temporarily continue as nearly normal as practicable the conduct of the Insured's business." *Id*. The expenses incurred by Rowan beyond those necessary in the normal operation of its operations solely as a result of the physical loss and damage caused by COVID-19 trigger coverage under the Policy's Extra Expense coverage.

**D.     Communicable Disease Response Coverage**

73.     The Policy's "Communicable Disease Response" coverage applies when an insured location "has the actual not suspected presence of communicable disease and access to such location is limited, restricted or prohibited by: (1) an order of an authorized governmental agency regulating the actual not suspected presence of communicable disease; or (2) a decision of an Officer of the Insured as a result of the actual not suspected presence of communicable disease…." Ex. A at POLICY 0034. Under this coverage, Defendant agrees to cover "the reasonable and necessary costs incurred by the Insured…for the: (1) cleanup, removal and disposal of the actual not suspected presence of communicable diseases from insured property; and (2) actual costs of fees payable to public relations services or actual costs of using the Insured's employees for

16

reputation management resulting from the actual not suspected presences of communicable diseases on insured property." *Id.*

74.     As a result of the actual not suspected presence of COVID-19, Rowan's Officers limited, restricted or prohibited access to their property, which caused Plaintiff to incur losses covered by the Communicable Disease Response provision in the Policy. In addition, the applicable stay-at-home Orders limited, restricted, or in certain cases, prohibited access to Plaintiff's property, which caused Plaintiff to incur losses covered by the Communicable Disease Response provision in the Policy.

75.     "Communicable Disease" is defined in the Policy's relevant part, as "disease which is transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges." Ex. A at POLICY 0086.

76.     Inclusion of this coverage means the Policy expressly acknowledges that communicable disease causes "injured physical loss or damage," and such physical loss requires "cleanup, removal and disposal."

77.     COVID-19 as a "Communicable Disease" is a covered cause of loss.

78.     The Communicable Disease Coverages are available regardless of their arising from precautionary measures or from the emergency Orders.

79.     There is no exclusion in the Policy for Communicable Disease or a Pandemic.

80.     There is no exclusion in the Policy for the actual contamination, the statistically determined risk of contamination, and any preventative actions taken relative to the same.

81.     There is no exclusion in the Policy for the suspected presence of a contaminant.

E.       **Interruption by Communicable Disease Coverage**

82.      The Policy also provides coverage for "Interruption by Communicable Disease" which applies when an insured location "has the actual not suspected presence of communicable disease and access to such location is limited, restricted or prohibited by: (1) an order of an authorized governmental agency regulating the actual not suspected presence of communicable disease; or (2) a decision of an Officer of the Insured as a result of the actual not suspected presence of communicable disease…." Ex. A at POLICY 0073. Under this coverage, Defendant agrees to cover the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY at such location with the actual not suspected presence of communicable disease." *Id.*

83.      As a result of the actual not suspected presence of COVID-19, Rowan's Officers limited, restricted or prohibited access to their property, which caused Rowan to incur losses covered by the Interruption by Communicable Disease provision in the Policy. In addition, the applicable emergency Orders limited, restricted, or prohibited access to Rowan's property, which caused Rowan to incur losses covered by the Interruption by Communicable Disease provision.

84.      The Interruption by Communicable Disease Coverage does not expressly preclude coverage under other coverages.

85.      Relative to Interruption by Communicable Disease and Communicable Disease Response Coverages, information of which insured locations have confirmed cases of COVID-19 contamination can be found on Rowan's website:  https://www.rowan.edu/returntorowan/ confirmed-covid-cases.html.

86.      As of the date of this filing, Defendant, through its adjuster, has acknowledged coverage under the Policy's Communicable Disease Response, Interruption by Communicable

Disease and Claim Preparation Costs provisions for three of those locations, and Rowan continues to provide updated information to Defendant as new confirmed cases are discovered.

### F.     Decontamination Costs

87.     The Policy also provide coverage for "Decontamination Costs," which covers "the increased cost of decontamination and/or removal of…contaminated insured property" if "insured property is contaminated as a direct result of insured physical damage and there is in force at the time of the loss any law or ordinance regulating contamination due to the actual not suspected presence of contaminants." Ex. A at POLICY 0036.

88.     A communicable disease is a physical loss or damage of the type insured under the policy. The actual presence of communicable disease at Rowan, which is not in dispute, is a "physical damage not excluded."

89.     There is no limit on "Decontamination Costs." *Id.* at POLICY 0036. If insured property is contaminated as a direct result of insured physical damage and there is in force at the time of the loss any law or ordinance regulating "contamination" due to the actual not suspected presence of "contaminant(s)," then this Policy covers, as a direct result of enforcement of such law or an ordinance, the increased cost of decontamination and/or removal of such contaminated insured property in a manner to satisfy such law or ordinance . . . ."  Here, the closing of all Rowan's campuses was a means of decontamination.

90.     The policy defines "contamination" as "any condition of property due to the actual or suspected presence of any . . . virus, disease causing or illness causing agent . . . ." *Id*. at POLICY 0086.  In other words, decontamination is appropriate if there is a suspected presence of virus.

### G.    Civil Authority

91.    The Policy provides coverage from an interruption to business caused by an order from a "Civil or Military Authority." Ex. A at POLICY 0066. Specifically, the Policy covers "the Actual Loss Sustained and EXTRA EXPENSE incurred by the insured during the PERIOD OF LIABILITY if an order of civil or military authority limits, restricts or prohibits partial or total access to an insured location provided such order is the direct result of physical damage of the type insured at the insured location or within five statute miles/eight kilometres of it." *Id.*

92.    This coverage applies because access to Rowan's property has been limited, restricted, and prohibited in part or in total due to the presence and threat of COVID-19 and related emergency Orders.

93.    Under the Policy, at least, actual communicable disease contamination of covered property is an insured physical damage as are "Preservation of Property" and "Decontamination". As noted, such actual contamination was pervasive in New Jersey, including within 5 statute miles of Rowan. Rowan was very much at risk.

94.    Specifically, Rowan has three campuses – Rowan University Glassboro, NJ; Cooper Medical School of Rowan University (CMSRU) located in Camden, NJ; and Rowan University School of Osteopathic Medicine (RowanSOM) located in Stratford, NJ.

- Relative to the RowanSOM campus at least:
  Jefferson Hospital
    18 East Laurel Road, Stratford. NJ 08084
  Silver Health Nursing Home
    141 Brace Road, Cherry Hill, NJ 08034
  Arden Courts Assisted Living
    2700 Chapel Avenue, Cherry Hill NJ 08002
  Lions Gate CCRC
    1100 Laurel Oak Road, Voorhees. NJ 08043

- Relative to the Rowan University Glassboro Campus at least:
  Inspira Hospital

700 Mullica Hill Road, Mullica Hill. NJ 08062
Jefferson Washington Township Hospital
435 Hurffville Cross Keys Road, Washington Township, NJ 08080

- Relative to the CMSRU campus at least:
    Cooper University Hospital
      1 Cooper Plaza, Camden, NJ 08103

### H.    Ingress/Egress

95.    The Policy provides "Ingress/Egress" coverage, which requires the Defendant to pay for "the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured…due to the necessary interruption of the Insured's business due to partial or total physical prevention of ingress to or egress from an insured location" provided that "such prevention is a direct result of physical damage of the type insured to property of the type insured." Ex. A at POLICY 0067.

96.     Ingress to and egress from Plaintiff's property has been partially or totally prevented due to COVID-19. The Executive Orders limited ingress/egress by limiting the size of gatherings, even for essential services, and the stay-at-home Orders which prohibited travel by students, staff and faculty, and potential students, except for limited purposes.

### I.    Additional Coverages

97.    The actual presence of COVID-19 at Rowan's locations and surrounding property and the emergency Orders have triggered coverage under many of the Policy's provisions including additional coverages not listed hereto and not limited to the following: "Contingent Time Element Extended"; "Expediting Costs"; "Claims Preparation Costs"; and "Attraction Property" coverages.

## VI.    The Policy's Contamination Exclusion Does Not Apply

98.    The Policy contains an exclusion that purports to preclude coverage for "contamination." Ex. A at POLICY 0025, 0026. Among other things, the Policy defines "contamination" as a "virus." *Id*. at 0086.

99.    The Policy's "contamination" exclusion does not exclude coverage for loss caused by "communicable disease."

100.    The Policy's "contamination" exclusion does not exclude coverage for Rowan's claim, which is based on the direct physical loss or damage caused by COVID-19 and the resulting emergency Orders.

101.    To the extent Defendant contends that the Policy's "contamination" exclusion bars coverage for loss caused by "communicable disease" or some other aspect of Rowan's claim, the Policy is ambiguous because it is susceptible to more than one reasonable interpretation and, therefore, must be construed in favor of coverage. See Royal Ins. Co. of Am. v. KSI Trading Corp., 563 F.3d 68, 74 (3d Cir. 2009) (under New Jersey law, "[w]here genuine ambiguity exists, such that the controlling language will support two meanings, one favorable to the insurer, and the other favorable to the insured, the interpretation sustaining coverage must be applied.").

102.    Like all exclusions, this exclusion must be narrowly construed. Villa v. Short, 195 N.J. 15, 23-24 (2008).  The reference to "virus" within "contamination" exclusion is clearly not intended to exclude coverage for a pandemic involving a "communicable disease."  Reading the Policy "as a whole in a fair and common sense manner," Cypress Point Condo Ass'n, Inc. v. Adria Towers, et al., 226 N.J. 403, 415 (2016), the reference to "virus" is limited to the pollution context like the other "contaminants." Thus, the exclusion clearly does not apply here to a case that does not involve pollution.

**VII.    The Insurer's Duties, its Arbitrary Denial and Company Line**

103.    Rowan, like others, purchased its insurance policy for business income protection caused by unforeseen disaster.

104.    During such times, individuals and businesses (including Rowan) are vulnerable and dependent on the Defendant's promises of coverage, a fact of which insurance companies (including the Defendant) has knowledge.  Insurance companies promise, warrant and sell "peace of mind" that in the unlikely event of a catastrophe or disaster the policyholder will be fully and promptly protected.

105.    The contract of insurance carries with it a duty of utmost good faith on the part of the insurer because of the vulnerability of policyholders during and following an insured cause of loss.  The Defendant's duties include but are not limited to the Defendant's obligation to fairly and quickly adjust Rowan's claims to determine coverage and amount of loss, adjust its insurance claims, and providing prompt payment.

106.    Here, Defendant made a blanket decision initially to deny all business income claims. Defendant failed to make a good faith investigation, determine coverage and adjust Rowan's claims because Defendant reached a pre-determined conclusion to deny coverage.

107.    On April 16, 2020, Rowan provided its first notice of loss to Defendant and showed it had incurred business income losses during the policy term.

108.    On June 5, 2020, other than the Communicable Disease coverages, Defendant denied the claim without any meaningful or honest investigation of the facts or contractual terms. The denial letter is attached hereto as Exhibit B. The Communicable Disease Response, Interruption by Communicable Disease and Claim Preparation Costs sublimit of coverage were acknowledged by Defendant's adjuster, but all other coverages have been summarily rejected.

109.    The Defendant summarily and arbitrarily asserted that Rowan's losses were not caused from direct physical loss of or damage to covered property, but provided no basis therefore.

110.    The Defendant summarily and arbitrarily did not adjust potential losses under the Policy coverages, simply relying on Defendant's pre-determined conclusions of no coverage.

111.    Without reasonable investigation, the Defendant made summary coverage determinations as to the inapplicability of civil authority coverage or other coverages but provided no basis for its factual conclusions.

112.    For example, the Defendant did not consider, nor did it have any procedures to consider that the applicable law has recognized the "direct physical loss of or damage to" language as ambiguous in cases where, as here, dangerous viruses entered a building, or were at imminent risk of entering a building.

113.    Instead, the Defendant chose to blanket deny coverage in violation of its contractual duty for the purpose of saving its bottom line.

114.    Upon information and belief, the Defendant used similar or same coverage decision language in different states, without regard for applicable state statutory and decisional case law affecting coverage.

115.    The Defendant's one-size-fits-all approach to its contractual and common law duties to act reasonably and in good faith to investigate claims, decide policy coverage, and make claim adjustments has led to the improper denial of countless business interruption claims, including Rowan's.

116.    Rowan has now been forced to file a lawsuit and will expend considerable efforts pursuing this action.

117.    Rowan (like others who purchase business interruption insurance) has faithfully paid its premiums.  Yet, when Rowan made a claim because of a catastrophic business interruption caused by state and local emergency Orders, the Defendant summarily and arbitrarily denied Rowan's claims.  At all relevant times, Rowan (like many businesses) relied on its business interruption insurance to cover what it is supposed to cover – replacement of business income and payment of ongoing expenses in order to rebuild its businesses.

118.    Accordingly, Rowan brings this suit in response to the Defendant's breach of its contractual obligation to pay Rowan's covered losses; and in response to Defendant's failure or refusal to adjust Rowan's claims under applicable coverages, and promptly pay Rowan's business income losses and claims.

119.    The losses Rowan suffered are covered under the Policy, but the Defendant has denied coverage despite Rowan's timely notice of its claim.

## COUNT I

## **BREACH OF CONTRACT**

120.    Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

121.    Plaintiff has a commercial property insurance policy issued by the Defendant.

122.    Plaintiff has performed all its obligations as specified by the Policy including the payment of all premiums due, cooperating in loss investigation, and seeking to prevent avoidable additional losses.

123.    Plaintiff's Policy provides coverage for losses, expenses, damages and costs, including but not limited to costs and expenses incurred mending or repairing the premises, business income loss, extended business income loss, and/or extra expense coverages.

124. As described in detail above, Plaintiff suffered a direct physical 'loss of' (or alternatively, 'damage to') its property at the covered locations, which was caused by or resulted from the emergency Orders described herein.

125. In the alternative, Rowan suffered and continues to suffer physical loss of and/or damage to its insured properties at the covered locations, which was caused by or resulted from the ubiquitous presence of the COVID-19 virus, and the numerous civil authority Orders, and emergency Orders, or both, all of which qualify as types of loss that "all risk" property policies are designed to insure.

126. Rowan further alternatively states that it suffered and continues to suffer physical loss of, or damage to its insured properties at the covered locations, which was caused by or resulted from:

(i) subject to circumstantial proof, actual on-site COVID-19 contamination—in referred locations of paragraphs 85-86—that caused a loss of, or damage to its property; or

(ii) its reasonable actions—regardless of emergency Orders—to preserve property and persons from an imminent risk of harm; or

(iii) the risk of imminent harm, which is itself a covered cause of loss; or

(iv) emergency Orders designating Rowan's business as uninhabitable and unusable on premises and in other forms; or

(v) emergency Orders pursuant to inherent authorities to act, regardless of the actual presence of COVID-19 virus on-site; or

(vi) the availability of other coverages under the Policy.

127.     This direct physical 'loss of' (or alternatively, 'damage to') Plaintiff's property caused the necessary slowdown or cessation of Plaintiff's normal operations, resulting in an actual loss of business income.

128.     The Policy also provides that the Defendant will pay for any necessary expenses that Plaintiff incurs that it would not have incurred had there been no physical loss or damage to its property.

129.     The Defendant is also in breach of the Policy by refusing to adjust potential losses under other potentially applicable coverages.

130.     As a result of the Defendant's repudiation or breach of the insurance policies, Plaintiff has suffered actual damages.

**WHEREFORE**, Plaintiff seeks compensatory damages resulting from the Defendant's breach of contract, an appraisal to determine the amount of damages, and further seeks all relief deemed appropriate by this Court, including attorneys' fees and costs.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff demands judgment against the Defendant as follows:

(1)     Awarding Plaintiff compensatory damages from the Defendant's breach of the insurance policy in an amount to be determined at trial or appraisal ordered by this Court, together with appropriate prejudgment interest at the maximum rate allowable by law;

(2)     Awarding Plaintiff costs and disbursements and reasonable allowances for the fees of Plaintiff's experts, and reimbursement of expenses;

(3)     Awarding Plaintiff attorneys' fees; and

(4)     Awarding such other and further relief the Court deems just, proper, and equitable.

## DEMAND FOR A JURY TRIAL

Plaintiff requests a jury trial for any and all Counts for which a trial by jury is permitted by law.

Respectfully submitted this 5th day of March, 2021.

**KANNER & WHITELEY, LLC**

By:  */s/ Allan Kanner*
Allan Kanner, Esq. (Bar No. 033981980)
Attorney Responsible for New Jersey Practice
Cynthia St. Amant, Esq. (*pro hac vice* forthcoming)
David J. Stanoch, Esq. (Bar No. 012902003)
701 Camp Street
New Orleans, LA 70130
Tel: (504) 524-5777
Fax: (504) 524-5763
a.kanner@kanner-law.com
c.stamant@kanner-law.com
d.stanoch@kanner-law.com
*Counsel for Plaintiff*